**CONTINUATION OF APPLICATION FOR SEARCH WARRANT**

I, Christopher Rieser, being duly sworn, depose and state that:

**INTRODUCTION**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of two cell phones described in Attachment A, which are currently in law enforcement's possession, and the extraction from the cell phones of electronically stored information described in Attachment B.

2.      I am a Task Force Officer (TFO) with the United States Drug Enforcement Administration, United States Department of Justice. I am an "investigative or law enforcement officer" as defined under 18 U.S.C. § 2510(7). As such, I am empowered by law to conduct investigations and to make arrests for crimes under federal law. I am currently assigned to the Grand Rapids Office in the DEA's Detroit Field Division. During my time as a Task Force Officer, I have participated in investigations of unlawful drug trafficking and money laundering and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, reviews of taped conversations and drug records, and have participated in investigations that included the interception of wire and electronic communications. I have participated in two federal wire intercept investigations. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect, lingo, and coded language used by narcotics traffickers. In connection with my duties, I investigate criminal violations of the Federal and State controlled substance laws including, but not limited to, conspiracy and attempt to possess

with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846; possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of 21 U.S.C. § 843(b), conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), 18 U.S.C. § 1956(a)(1)(B)(i), and 18 U.S.C.§ 1957.

3. The facts in this continuation come from my personal observations, my training and experience, and information obtained from other law enforcement officers, agents, and witnesses. This continuation is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. I am personally involved in the investigation of the offenses referred to below. In addition to my personal knowledge, the statements contained in this Affidavit are based in part on:

a. Information provided by DEA Agents, Kalamazoo Valley Enforcement Team (KVET), Southwest Enforcement Team (SWET), and other law enforcement officials, including oral and written reports that I have received directly or indirectly from DEA and other law enforcement officials;

b. interviews with confidential sources;

c. results of physical surveillance conducted by DEA Agents and other law enforcement officials, which have been reported to me either directly or indirectly;

d. my training and experience as a Task Force Officer; and

e. the training and experience of DEA agents and investigators, Kalamazoo Valley Enforcement Team officers, and other law enforcement officials with

whom I have spoken regarding this investigation, or whose reports I have reviewed.

5.      DEA seized the two cellular telephones described in Attachment A during the execution of a federal search warrant at Michael Donnell NEELEY's residence at 1509 Portage Street, Kalamazoo, MI on December 4, 2017.

6.      On the basis of the information contained in this continuation, my experience and training, and on the basis of other information that I have reviewed and determined to be reliable, probable cause exists to believe that evidence of drug trafficking involving Michael Donnell NEELEY and other co-conspirators will be stored or contained in the two cell phones.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

7.      The devices (hereinafter "Devices" or "two cell phones") to be examined are: 1) A black and white Samsung Galaxy J7 Cellular Phone, Model SM-J700P, DEC #: 089483879103354695, cell phone number 269-217-5927 and 2) a Black ZTE Cellular Phone, Model Z799VL, S/N: 329F75250ED0, IMEI 990006896624227, cell phone number unknown. The Devices are currently in the possession of the Drug Enforcement Administration in Grand Rapids, Michigan.

8.      The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically-stored data particularly described in Attachment B.

## PROBABLE CAUSE

9.      In January 2017, investigators with the Kalamazoo Valley Enforcement Team (KVET) and the Southwest Enforcement Team (SWET) initiated a joint investigation into NOEL FRANCISCO SALDANA, aka "Misery," and his involvement in the distribution of large quantities of crystal methamphetamine in Kalamazoo and Van Buren counties in

Southwest Michigan. During this investigation, a Confidential Source (CS) conducted multiple controlled purchases of crystal methamphetamine from SALDANA. The CS also had multiple phone conversations and personal meetings with SALDANA while under DEA and KVET investigators' direction and monitoring. Many of these conversations were recorded. The controlled purchases of crystal methamphetamine occurred on the following dates in 2017: February 9, February 16, March 8, March 15, April 20, and May 23, 2017. The total weight of the crystal methamphetamine purchased during these transactions was approximately 2.26 pounds (1,026.2 gross grams).

10. On September 26, 2017 and September 28, 2017, the United States applied for and received authorization to intercept wire and electronic communications occurring to and from two cellular telephones respectively assigned telephone number (269) 350-0265 (Target Phone #1) and (269) 308-9170 (Target Phone #2). Target Phone #1 and Target Phone #2 were both used by Noel Francisco SALDANA.

11. The United States intercepted wire and electronic communications over Target Phone #1 and Target Phone #2 for a period of 30 days. Interception authority for Target Phone #1 expired on October 27, 2017 and for Target Phone #2 expired on October 26, 2017. During this period, the United States intercepted approximately 154 drug-related communications over Target Phone #1 and 436 drug-related communications over Target Phone #2.

12. On November 3, 2017, the United States applied for and received authority to renew interception of wire and electronic communications occurring to and from Target Phone #2. The United States also received initial authority to intercept wire and electronic communications occurring to and from 404-991-9847 (Target Phone #3) used by Thomas Lee COWLEY.

13.     The United States intercepted wire and electronic communications over Target Phone #2 and Target Phone #3 until December 2, 2017. During this 30-day period, the United States intercepted approximately 472 drug-related communications over Target Phone #2 and 426 drug-related communications over Target Phone #3.

14.     Interceptions over Target Phone #1, Target Phone #2, and Target Phone #3 showed that SALDANA would order and receive multiple pound shipments of crystal methamphetamine from an individual in Arizona identified as Jesus Manuel RAMIREZ-LUNA. The intercepted communications, coupled with law enforcement surveillance further revealed that SALDANA, Thomas Lee COWLEY, Sheryl AYAD, Michael Donnell NEELEY, and others coordinated the receipt of these shipments of methamphetamine from RAMIREZ-LUNA by having the packages sent to various addresses that AYAD provided throughout Kalamazoo and Van Buren counties. In many instances, AYAD picked up the shipments herself or with assistance from others.

15.     After the shipments were received, the conspirators would break down the shipments for further redistribution. Law enforcement identified 223 N. Sage Street, Apartment #3C in Kalamazoo, Michigan as a stash location. This apartment is the residence of Thomas Lee COWLEY's brother, Thomas Lewillan COWLEY, JR. Intercepted communications and surveillance showed that Michael Donnell NEELEY, who was residing at 1509 Portage Street, provided this location as a meeting place for SALDANA and Thomas Lee COWLEY during crystal methamphetamine package deliveries. 1509 Portage Street is the location that NEELEY used to store and distribute the crystal methamphetamine he was provided during the conspiracy. Co-conspirators Justin Owen SMITH, Sheryl Lynn AYAD, and Thomas Lewillan COWLEY, JR. received crystal methamphetamine from SALDANA

and Thomas Lee COWLEY for further redistribution. Wire interceptions and surveillance also showed that Robert NICHOLS and David STRICKLER helped receive crystal methamphetamine shipments on certain occasions.

16. Based on the intercepted communications, law enforcement was able to intercept and seize three shipments of crystal methamphetamine. The investigation obtained search warrants for each of these three packages, which were, respectively, seized on October 6, 2017, November 24, 2017, and November 25, 2017. The aggregate weight of the crystal methamphetamine contained in the three packages totaled approximately 4.8 kilograms.

17. During the course of the Title III wiretap investigation and associated surveillance, which took place from September 26, 2017 until December 2, 2017, law enforcement intercepted communications that NEELEY had with SALDANA and Thomas Lee COWLEY concerning the distribution of methamphetamine and were able to identify NEELEY's cellular telephones to be 269-370-9678 and 269-217-5927. During the wiretap, NEELEY used cellular phone number 269-217-5927 to call SALDANA'S Target Phone #1. Law enforcement intercepted 28 of these calls. NEELEY used cellular phone number 269-370-9678 to call SALDANA's Target Phone #2. Law enforcement intercepted 127 of these calls. NEELEY also used cellular phone number 269-217-5927, to call Thomas Lee COWLEY'S Target Phone #3. Law enforcement intercepted 12 of these calls. What follows are excerpts of some of the pertinent conversations intercepted between NEELEY and other co-conspirators.

18. On September 28, 2017, at approximately 3:23 p.m., Call #148, SALDANA, using Target Phone #2, had an intercepted voice conversation with Michael NEELEY aka "Fat Boy," (269-370-9678). SALDANA stated, "Hello, fat boy. [U/I]. What's going on over

there?" NEELEY said, "Um…not too much." SALDANA stated, "Nothing." NEELEY said, "No, not really." SALDANA stated, That's depressing." NEELEY said, "Yea, it is. [Pause] For the both of us." SALDANA stated, "What?" NEELEY said, "I said, yeah it is. It's depressing for both of us. So, [Pause] I'll see what I could make happen though." SALDANA stated, "I got, I got a couple little ones, man. You want me to bring them up there?" [SALDANA was telling NEELEY he has several ounces of crystal methamphetamine that SALDANA could bring to NEELEY at 1509 Portage Street in Kalamazoo.][1] NEELEY said, "Yes, please. I just…everybody..all…you know, all the nephew calling me. You…I thought you was him calling back. [Pause] I'll sell them right now. [U/I]. [NEELEY explained to SALDANA that his nephews were calling him to purchase crystal methamphetamine and NEELEY did not have any to sell them right now. NEELEY confirmed to SALDANA that if SALDANA had crystal methamphetamine to bring him, NEELEY would be able to sell the crystal methamphetamine quickly.] SALDANA stated, "Alright. Just tell them to be ready, man. I'm gonna head that way here in a few minutes."

19.    Law enforcement kept surveillance on 1509 Portage Street. At approximately 4:03pm, law enforcement saw NEELEY unlock the south side door to let SALDANA into the building. At the same time, law enforcement intercepted Call #152 from SALDANA to NEELEY at 269-370-9678. SALANDA stated, "Open up this door, fat boy." NEELEY said, "Alright."

20.    On October 3, 2017, at approximately 10:21 p.m., Call #298, SALDANA, using Target Phone #2, had an intercepted voice conversation with Michael NEELEY aka "Fat

---

[1] At various points in this continuation, I have included in brackets my interpretation of words and phrases used in the recorded conversations. My interpretations are based on the contents and context of the recorded conversation, events that took place before and after the conversations, my knowledge of the investigations as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation.

Boy," on 269-370-9678. [Beginning of pertinent conversation] NEELEY stated, "Shit, I say, uh, what's, uh, what are we looking like?" [NEELEY was asking SALDANA if a shipment of crystal methamphetamine had arrived.] SALDANA stated, "Uh, lookin' like Thursday and Friday, back to back." [SALDANA informed NEELEY that he had two packages of crystal methamphetamine in transit and was expecting their arrival on Thursday and Friday]. NEELEY said, "Damn." SALDANA stated, "It went out…It went out today, allegedly." NEELEY said, "Oh. What the fuck? What the fuck? [U/I] SALDANA stated, "Yeah, tell me about it." NEELEY said, "The whole city dry." [NEELEY was complaining to SALDANA that no one in Kalamazoo had crystal methamphetamine to sell right now.]

21. On October 6, 2017, at approximately 5:21 p.m., Call #364, SALDANA, using Target Phone #2, had an intercepted voice conversation with Michael NEELEY aka "Fat Boy," 269-370-9678. Following is an excerpt of the conversation: SALDANA stated, "Well, wake the fuck up. We got work to do. I'm going to be there in a minute." [SALDANA was informing NEELEY that a shipment of crystal methamphetamine had arrived and that he was on his way to meet NEELEY at his residence at 1509 Portage Street.] NEELEY said, "Alright."

22. Investigators on surveillance observed SALDANA arrive at 1509 Portage Street and NEELEY let SALDANA into the south side door. This was confirmed during a short intercepted phone call from SALDANA, using Target Phone #2 (Call #365) to NEELEY at 269-370-9678. SALDANA told NEELEY, "The door, fat boy."

23. Later in the day on October 6, 2017, at approximately 7:24 p.m., Call #382, SALDANA, using Target Phone #2, had an intercepted voice conversation with Michael NEELEY aka "Fat Boy," at 269-370-9678. Following is an excerpt of the conversation:

SALDANA stated, "Save...Save me half, man. I'm gonna...I'm gonna need half...a half

back, 'cause the other one didn't make it." [SALDANA told NEELEY he needed half of the

crystal methamphetamine back that SALDANA left at 1509 Portage Road several hours earlier

because the second package of crystal methamphetamine they were anticipating was not

delivered. In fact, law enforcement had seized this package of crystal methamphetamine,

which weighed approximately 7 pounds.] NEELEY said, "Oh, it didn't?"

24.     After law enforcement intercepted this package of crystal methamphetamine on

October 6, 2017, NEELEY had additional drug-related communications with SALDANA and

Thomas Lee COWLEY using cell phone number 269-370-9678. From October 6, 2017 until

October 26, 2017, there were approximately 20 additional drug-related intercepted

communications involving NEELEY. Between November 2, 2017 and December 2, 2017, law

enforcement intercepted approximately 119 additional drug-related communications involving

NEELEY, who was using 269-370-9678. The intercepted conversations included

conversations about selling the crystal methamphetamine, payment to SALDANA for the

narcotics sold, and NEELEY'S assistance in facilitating money deposits of the drug proceeds

to the source of supply in Arizona.

25.     On December 2, 2017, at approximately 1:08 p.m., Call #1141, SALDANA,

using Target Phone #2, had an intercepted voice conversation with Thomas Lee COWLEY,

using Target Phone #3 (404-991-9847). During the conversation, SALDANA told COWLEY

that he had left crystal methamphetamine with NEELEY at 1509 Portage Street from a

shipment that had just been delivered. Law enforcement confirmed the delivery of this

package to SALDANA through surveillance. Following is an excerpt of SALDANA's

conversation with COWLEY: SALDANA stated, "Hey...is, a...is a two piece man, I left, I

left yours with fat ass." [SALDANA told COWLEY that he received 2 pounds of crystal

methamphetamine in the shipment, and SALDANA left COWLEY'S portion of the crystal

methamphetamine with "fat ass," i.e., NEELEY.] COWLEY stated, "Alright, yeah, I saw him

um…pulling up as we was leaving."

26.     On December 2, 2017, at approximately 9:41 p.m., Call #1882, SALDANA,

using Target Phone #2, had an intercepted voice conversation with Thomas Lee COWLEY,

using Target Phone #3 (404-991-9847).  Following is an excerpt of the conversation:

SALDANA stated, "Well, I just talk to fat ass right now and he just wanted me to know

everything is gone over there already." [SALDANA told COWLEY that he spoke with

NEELEY, who just reported that he had sold the 2 pounds of crystal methamphetamine that

SALDANA left with him at his residence at 1509 Portage Street.] COWLEY said, "Really?"

27.     On December 4, 2017, DEA, KVET, and SWET executed federal search

warrants at eight locations and arrested the eight west Michigan-based co-conspirators on a

200-page criminal complaint. *See* 1:17-MJ-370.  Law enforcement arrested the source of

supply, Jesus Manuel RAMIREZ-LUNA, approximately one week later in Arizona. *See* 1:17-

MJ-379.

28.     During the execution of the search warrant at Michael NEELEY's residence,

1509 Portage Street, law enforcement seized the black and white Samsung Galaxy J7 cell

phone and black ZTE cell phone.  During a search of NEELY'S bedroom, law enforcement

seized a loaded Kel-Tec 9mm semi-automatic handgun, Psilocybin mushrooms, 2 digital

scales, and a large plastic bag containing between 1 and 2 kilograms of marijuana.  The

firearm and mushrooms were found together, in NEELEY'S bedroom, laying on top of a

bookcase/dresser.  The large plastic bag of marijuana was found behind the same bookcase and

additional bags of marijuana were found in the closet and under NEELEY'S bed. NEELEY'S white Samsung cell phone was found to be plugged into a charger laying on the bed-side table and the black ZTE cell phone was lying on the TV dinner stand. NEELEY stated both cell phones belonged to him.

29. On December 21, 2017, SALDANA, RAMIREZ-LUNA, Thomas Lee COWLEY, AYAD, NEELEY, Thomas Lewillan COWLEY, JR., SMITH, NICHOLS, and STRICKLER were indicted by a grand jury in the Western District of Michigan with conspiracy to distribute and to possess with intent to distribute 50 grams or more of methamphetamine. The grand jury returned a First Superseding Indictment on February 7, 2018 and a Second Superseding Indictment on March 6, 2018. *See United States v. Saldana, et. al.,* 1:17-cr-271 (JTN). As of this application, SALDANA, RAMIREZ-LUNA, Thomas Lee COWLEY, AYAD, SMITH, and STRICKLER have pled guilty to conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine. The conspiracy charge remains pending against NEELEY, Thomas Lewillan COWLEY, JR., and Robert NICHOLS. Additional charges pending against NEELEY include felon in possession of a firearm, possession with intent to distribute marijuana, and possession of a firearm in furtherance of drug trafficking.

30. Based upon my training and experience, as well as the training and experience of others, I understand the following about drug traffickers:

      a. People engaged in drug trafficking frequently utilize cellular telephones to facilitate their transactions. Cellular telephones are portable, and many mobile telecommunications service providers do not require purchasers of the devices to provide their names and/or addresses, so

narcotics traffickers often use the devices in an effort to avoid detection by law enforcement.

b.    Mobile phones often contain evidence indicative of drug trafficking, including records of incoming and outgoing calls; text messages; emails, photographs of drugs, coconspirators, or currency; and, in the case of "smart phones," Global Positioning System (GPS) data indicating the location of the device at given points in time. Additionally, drug traffickers typically maintain and use multiple mobile phones to facilitate sales, and frequently switch phones to evade detection by law enforcement. Further, these types of devices are frequently used to access social media websites such as Facebook, Instagram, etc. Based on my training and experience, and the training and experience of other law enforcement agents, drug traffickers are using social media with increasing frequency to communicate with suppliers and purchasers of narcotics.

c.    Persons who sell drugs will often keep documents, phone numbers of other drug dealers and phone numbers of their drug sources stored within their cellular telephones; and

d.    Drug traffickers often take, or cause to be taken, photographs and videos of themselves, their associates, their property and/or their drugs, often storing them on their cellular telephones.

31.    Based on the foregoing recitation of facts, and in light of my training and experience, as well as the training and experience of other law enforcement officers, I submit

that there is probable cause to believe that the Devices listed in Attachment A contain historical information concerning call activity; information stored in the phone's "phonebook" or "contacts" directory; stored voice-mails; emails; text messages; electronic files; photographs; video images; and records of internet searches and transactions that are evidence of violations of federal controlled substance laws.

## TECHNICAL TERMS

32.    Based on my training and experience, I use the following technical terms to convey the following meanings:

   a.    Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system

("GPS") technology for determining the location of the device.

b.     Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.     Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.     GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where

it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.   PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For

example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.     Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "Wi-Fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.     IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.    Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

33.    Based on my training, experience and research, and from consulting the manufacturer's advertisements and product technical specifications available online at http://www.bestbuy.com, I know that the DEVICES have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on cellphones can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

34.    The requested warrant would authorize the extraction and copying of electronically store information, all under Rule 41(e)(2)(B).

35.    Based on my knowledge, training, and experience, I know that cell phones can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on a device.  This information can sometimes be recovered with forensics tools.

36.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). With regard to computers and hard drives, virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact electronically stored information on

a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

37. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

38. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

39.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

## **ATTACHMENT A**

The property to be searched consists of the following two cell phones (the "Devices"):

- A black and white Samsung Galaxy J7 Cellular Phone, Model SM-J700P, DEC #: 089483879103354695, cell phone number 269-217-5927

- A black ZTE Cellular Phone, Model Z799VL, S/N: 329F75250ED0, IMEI 990006896624227, cell phone number unknown.

The Devices are in the custody of the Drug Enforcement Administration in Grand Rapids, Michigan.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

**This warrant authorizes the search of the Devices described in Attachment A for:**

1.       All records on the Devices described in Attachment A that relate to violations of 21 U.S.C. § 841(a)(1) involving Michael Donnell Neeley and others, including:

   a.   Drug transaction records including receipts; stored electronic financial methods of payments; lists of transactions, purchasers, and suppliers and related identifying information; types, amounts, and prices of drugs trafficked, including dates when trafficked; amounts involved in specific transactions; and, photographs of drugs and other evidence of drug trafficking;

2.       Evidence of who used, owned, or controlled the Devices, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

3.       Any input/output peripheral devices, passwords, data security devices, and related security documentation that could be related to the Devices;

4.       Evidence of software that would allow someone or something other than the user to control the Devices, such as viruses, Trojan horses, spyware, malware, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

5.       Evidence of the lack of such malicious software on the Devices;

6.       Evidence of software designed to protect the Devices from other persons, software, devices, or intrusions that may attempt to infiltrate, access, or control the Devices, such as pop-up blockers, security software, password protection, and encryption;

7.       Evidence of other storage devices being attached to the Devices;

8.      Evidence of counter-forensic programs and hard drive/computer cleaning programs (and associated data) that are designed to eliminate data from the Devices or frustrate the efforts of law enforcement to locate evidence on the Devices;

9.      Evidence of peer-to-peer file-sharing software and the Globally Unique identifier (GUID) associated with the peer-to-peer software/program on the Devices;

10.     Evidence of the times the Devices were used;

11.     Evidence of where the Devices were used, including evidence of wireless Internet networks and Internet Protocol (IP) addresses;

12.     Passwords, encryption keys, and other access devices or programs that may be necessary to access the Devices;

13.     Documentation and manuals that may be necessary to access the Devices or to conduct a forensic examination of the Devices;

14.     Records of or information about Internet Protocol addresses used by the Devices;

15.     Records of or information about the Device's Internet activity: firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

16.     Any and all records, documents, invoices, notes and materials that pertain to accounts with any Internet Service Provider, as well as any and all records relating to the ownership or use of the Devices; and

17.     Documents and records regarding the ownership and/or possession of 1509 Portage Street, Kalamazoo, MI and the Devices.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.